UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TINA WINN                                          CIVIL ACTION

VERSUS                                             NO. 12-2690

CAROLYN W. COLVIN, ACTING                          SECTION "B" (2)
 COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, Tina Winn, seeks judicial review pursuant to Section 405(g) of the Social

Security Act (the "Act") of the final decision of the Commissioner of the Social Security

Administration (the "Commissioner"), denying plaintiff's claim for disability insurance

benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and

XVI, respectively, of the Act. 42 U.S.C. §§ 405(g), 423, 1381a. This matter was referred

to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule

73.2(B).

As ordered, plaintiff filed a timely memorandum of facts and law in support of her

appeal. Record Doc. No. 15. Defendant filed a timely reply memorandum of facts and

law. Record Doc. No. 16.

## I.    PROCEDURAL HISTORY

Winn filed applications for DIB and SSI on September 27, 2010, alleging

disability since September 1, 2008, due to manic depression, bipolar disease and attention

deficit hyperactivity disorder. (Tr. 155-64, 183). She amended her alleged onset date

to September 1, 2009 in her pre-hearing brief. (Tr. 240). After her applications were denied, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on February 18, 2011. (Tr. 25-61). On October 25, 2011, the ALJ issued a decision denying plaintiff's applications for benefits. (Tr. 12-21). After Winn submitted additional evidence to the Appeals Council, it denied review on September 20, 2012, and the ALJ's decision became the final decision of the Commissioner for purposes of this court's review. (Tr. 1-6).

II.  STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.  The ALJ failed to consider adequately whether plaintiff's impairments meet or equal Listing 12.05(C).

B.  The ALJ's assessment of Winn's mental residual functional capacity is not supported by substantial evidence. The ALJ's hypothetical to the vocational expert failed to incorporate all of plaintiff's disabilities and the ALJ improperly modified her own hypothetical.

C.  The Commissioner failed to weigh and consider adequately the treating source opinions by Dr. Harshad Patel and Dr. Charles Chester, which were submitted to the Appeals Council.

III.   <u>ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL</u>

The ALJ made the following relevant findings:

1.      Winn has not engaged in substantial gainful activity since September 1, 2008, the alleged onset date.[1]

2.      She has severe impairments of affective disorder, anxiety disorder, attention deficit hyperactivity disorder and borderline intellectual functioning.

3.      Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 4, Subpart P, Appendix 1, including specifically Listings 12.04 for affective disorders, 12.05 for mental retardation and 12.06 for anxiety related disorders.  The paragraph C criteria of Listing 12.05 are not met because she does not have a valid verbal, performance, or full scale IQ of 60 to 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function

4.      Winn has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently; sit and stand and/or walk up to six hours in an eight-hour day; perform simple, unskilled tasks that require no timed production (no individually timed tasks); she cannot perform fast food work; she can have only incidental contact with the general public; and she cannot engage in team work (<u>i.e.</u>, team member not required for task completion).

5.      Although her medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

---

[1]It is unclear whether this date is merely a typographical error, as defendant argues, or whether the ALJ failed to acknowledge that plaintiff had amended her onset date to 2009, as she argues.  In either case, no prejudice resulted from the error, as the ALJ thoroughly reviewed all of the evidence through the date of her decision.

6.      Winn is unable to perform any of her past relevant work as a receptionist, cashier checker or general clerk.

7.      Based on plaintiff's age, high school education, work experience and residual functional capacity, jobs exist in significant numbers in the national economy that she can perform, such as dishwasher, maid or housekeeper, and janitor.

8.      Winn has not been under a disability at any time from September 1, 2008 through the date of the decision.

(Tr. 23-31).

## IV.   ANALYSIS

### A.      Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d at 393.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."  Newton v. Apfel, 209

F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Perez, 415 F.3d at 461.  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for SSI or DIB,[2] plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2011).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920;

---

[2]The relevant law and regulations governing a claim for DIB are identical to those governing a claim for SSI.  Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994); Hollis v. Bowen, 837 F.2d 1378, 1382 n.3 (5th Cir. 1988).

Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[3]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry.  If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Id.; Newton, 209 F.3d at 453.

--------

[3]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history."  Martinez, 64 F.3d at 174.

B.    Factual Background

Plaintiff testified that she was 42 years old and had completed the twelfth grade. When asked whether she had been in special education, she said that she was in "reading lab" when she was little, but was in regular classes in high school.  She stated that she attended Eastern College, a vocational training school, and finished the course to be a medical assistant.  (Tr. 32-33).  She had no further training or education.

Winn said she has lived with her aunt for two to three years.  She testified that she was married twice and has two grown children and a four-year old grandson.  (Tr. 33-34). She said that her daughter brings her grandson to see her about every two weeks.

Plaintiff stated that her mother drove her to the hearing.  She said she has a driver's license and has no problems with driving, but she only drives when she has to go to a doctor's appointment and does not go anywhere else.  (Tr. 34-35).  She testified that she does not limit herself as to how far or where she will drive, but she does not like to leave the house and only goes out when she must.  (Tr. 35).

Winn said she is five foot three or four inches tall and weighs about 185 pounds. She testified that she has gained a lot of weight in the last few years because she is not

motivated, does not do anything, stays in bed and sleeps a lot.  She stated that she is right-handed and has no problems using her hands.  (Tr. 35).

Plaintiff testified that she last worked in August 2009 at McDonalds, "getting the orders ready and the drinks and pushing the food out and sometimes doing the fries." She said she was there for  a couple of months and left because her hours were cut.  She testified that she was given a time limit to push orders out and make sure everything was right, but that she could not do it properly and "would mess up,"  so her managers "were getting aggravated," cut her hours and told her they did not need her.  (Tr. 36).  She stated that she had to read an order on a screen, but it would disappear quickly and she had to remember it.  She said that her managers got mad because she had to put the orders out in a set number of minutes, but she "would mess up too much."

Winn stated that she previously worked as a cashier at some grocery stores and at a few doctors' offices.  She said she worked as a cashier and parts stocker at Auto Zone, but left there to go to school to learn to be a medical assistant. (Tr. 37).  She testified that she worked at three different places as a medical assistant. (Tr. 37-38).  She said she had worked as a receptionist at Walker Acura, a car dealership, and as a medical assistant at Laser Concepts, the Medical Center and the Family Practice Center.

Plaintiff testified that she checked in patients, did the charts "and [did] all kinds of stuff" at Laser Concepts, which was a doctor's office.  She said it was also known as Family Medical Center.  (Tr. 38-39).

8

Winn said she answered the phone, connected calls and took messages at the Walker dealership, but she did not deal with customers in person.  She did not remember how long she worked at Walker Acura, but thought it was only a few months.  She stated that she was fired or laid off, but did not know why, although she guessed that she was not doing the job properly.  She thought she was told that she "messed up a lot."  She testified that she had a speech problem when she was little and that she could not pronounce or remember some of the last names of important people at Walker Acura. (Tr. 39-40).

Plaintiff testified that her other two medical jobs were like the one at Laser Concepts and that she answered the phone, checked in the patients and made copies of their insurance cards.  She said she lost "a lot of my jobs at the doctor's office" because she would "rattle on," could not concentrate and could not do multiple tasks at one time. (Tr. 40-41).  She stated that she was told she made the patients nervous because she was not "laid back and quiet," as she was supposed to be in a doctor's office.  She did not know how long she had worked as a medical assistant in total.  She said she had "jumped around, trying to find jobs" and was always told they did not need her because she did not fit in and she lost a few medical jobs for that reason.

Winn stated that her longest medical assistant job was working for "Dr. Fooshee [phonetic]," also known as the Family Practice Center, when she had just finished school and was required to do "that extern-thing like."  (Tr. 41).  She thought that Dr. Fooshee

only kept her because she had to finish her last class and was being graded for her work. She said the course lasted for three months.  She stated that she worked at the Laser Center for about two months and at the Medical Center for a few months until "they got aggravated with me."  (Tr. 42).

Plaintiff stated that she worked at Zapato's, a grocery store,[4] as a cashier in 2007, the year she made the most money, and that she worked there for about one and one-half years.  She did not know why she left that job, but thought it might have been because she found the job at Walker Acura, where she worked next.  (Tr. 43).

Winn testified that she never worked as a medical assistant in one place for two years.  She said she worked at Auto Zone for two years.  She stated that she could not work even at a job that does not require her to deal with people so much because she has no motivation and does not want to leave her house.  She said she feels safer being in her house.  She did not know what had changed from the time when she was able to work, except that she gets nervous when out of the house.  (Tr. 44).

Plaintiff stated that she sees someone to help with her nervousness, but she only leaves the house when she has to.  She said her aunt and her son run errands for her when she needs something.  Regarding mental health treatment, she stated that she saw Dr. Sanders once a couple of years ago and then saw Dr. Harshad Patel, a family practice and

---

[4]This probably should be Zuppardo's, which is a grocery store in the New Orleans, Louisiana area.

internal medicine and practitioner, Record Doc. No. 11-7 at pp. 5, 11, for four to five years.  She said that Dr. Patel "kept recommending" that she see a psychiatrist and that she started seeing a psychiatrist earlier this year.  She did not know why she did not go before.  She stated that she told Dr. Patel her problems and he gave her medication for depression, but he kept telling her that she really needed to see a psychiatrist or someone like that.  (Tr. 45-46).

Winn testified that she gets distracted, cannot concentrate and cannot remember anything.  She feels like her mind is running a mile a minute.  She said this has been a problem before and that she "lost all my jobs in the past" because of it.  She stated that, for example, co-workers would "holler at me because 'You can't read the order right there?  It's right there, Tina,' . . . and 'You gave those people the wrong order,' . . . and they make me nervous and embarrassed."  (Tr. 46-47).  She said that the doctors for whom she worked brought her into their offices a few times to tell her that she had a good personality, but she just did not fit in because she did not know how to do something, which she found very embarrassing.  She stated that she went to vocational school because she wanted to work.  She remembered that a co-worker at Auto Zone laughed at her when she said she was going to school and told her that she would not be able to do it or to get a job because she was "hyper," could not concentrate and could not get anything right.  (Tr. 47).

11

Plaintiff testified that, when she leaves the house, she feels like she cannot breathe because everyone is looking at her. She wants to just run in and out when she goes somewhere and she hopes that she does not see anyone she knows, so she can get out and go straight home. She said she feels safer in her own house. She stated that, since she went to the mental health center, she has bad days when she stays in bed most of the time and good days when she is able to get out of bed, go to the living room and watch television. She said that she still sleeps a lot and feels better when she is asleep. She testified that she gets her days and nights mixed up. She said she sleeps in the daytime and is awake all night, pacing the floor because she is not tired. She stated that, even when she is tired, she keeps thinking and walking around the house at night. Winn said that going to the mental health center helps, but she wishes that they could come to her house and that she did not have to go there. (Tr. 49-50).

Upon questioning by the vocational expert, plaintiff clarified that she did not work as a medical assistant, but as a receptionist. She said she was trained for triage, but she could never learn how to take blood pressure and she was afraid to give shots. She stated that the only thing she could do was take a patient's temperature. (Tr. 51). She testified that she sat in the front office instead of doing triage because she could not learn how to hear through the stethoscope and she would "mess up" the pump for taking blood pressure. (Tr. 51-52).

C.     Vocational Expert Testimony

Kelly Roberts, a vocational expert, testified by telephone that plaintiff's past relevant work was not as a medical assistant, which requires taking vital signs, administering shots and doing much more than front office work.  (Tr. 52).  She stated that plaintiff's past jobs, as performed, were as a receptionist, which is sedentary work with an SVP of 4[5]; a fast-food worker, which is unskilled, light work; and cashier checker and general clerk at the automobile dealership, which are both semi-skilled, light jobs. (Tr. 53-54).

The ALJ posed a hypothetical of a person of plaintiff's age, education and past work experience who has no exertional limitations and can perform light work, defined as being able to lift 20 pounds occasionally and 10 pounds frequently, to sit up to six hours in an eight-hour day and to stand and/or walk for six hours in an eight-hour day. The person could perform only simple, unskilled tasks with no timed production, no fast

[5]SVP refers to the "specific vocational preparation" level, which is defined as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles, Appendix C, page 1009 (4th ed. 1991). . . .

> As stated in SSR 00-4p, 2000 WL 1898704 at *3:
> The DOT lists a specific vocational preparation (SVP) time for each described occupation.  Using the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.

Bray v. Comm'r, 554 F.3d 1219, 1230 n.4 (9th Cir. 2009); accord Creech v. UNUM Life Ins. Co., 162 F. App'x 445, 459 (6th Cir. 2006); Dikeman v. Halter, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001); Jackson v. Astrue, No. 4:11-CV-28-Y, 2011 WL 4943547, at *9 n.8 (N.D. Tex. Aug. 23, 2011), report & recommendation adopted, 2011 WL 4940998 (N.D. Tex. Oct. 17, 2011).

food work, only incidental contact with the general public and no team work.  (Tr. 54-55).  Roberts testified that such an individual would be unable to perform plaintiff's past relevant work.  She stated that, as to jobs that do not require dealing with the public, there is usually work as a dishwasher or housekeeper, but those positions require that a certain amount of work be completed in a certain amount of time, and there is an issue with the teamwork.  (Tr. 55).

The ALJ then asked:

Q:  So for example, housekeeping, where the individual would be in a solitary position, they'd still need to get so many done by the end of the day.  My question is more geared towards no timing for the specific task as long as the task is completed by day's end.  For example –
A.  That – that doesn't change my answer then, your honor, because when you say "no timed production," then I'm – I was looking at it differently than that.  If they can handle quotas in terms of they have to be able to clean ten rooms in a shift and it does get done by the end of the shift, certainly that would be a position.  But it – typically with housekeeping [or positions] [phonetic], it's not always a solitary position.  Sometimes there are two, maybe just two working together, but there are those instances.  I can't guarantee that they would always be solitary in doing the work on their own unless they were working [INAUDIBLE].
Q.  Now, with your understanding that I was trying to avoid what the claimant said with fast food that she had to get each item of food out within so many seconds . . . .  That's what I meant by no timed production. . . . [O]f course, the individual's got to get their work done for purposes of this hypothetical.
A.  I'm [INAUDIBLE] I do have one more question that – in order to clarify.  In terms of no teamwork – because that is a sort of general statement; so I just want to be clear because typically, say, dishwasher is working in a kitchen with lots of people around them.  Now, it may be just them and one other person who are actually cleaning the dishes, but you will be surrounded by other workers and . . . they may ask you a question.  So I just want to make sure when you say [INAUDIBLE] teamwork.

Q.  By no teamwork, I'm saying no teamwork required to complete the
task.  I'm not excluding that coworkers will be in the vicinity.

(Tr. 55-57).

In response to these clarifications, Roberts testified that the hypothetical person

would be able to work as a dishwasher, maid and housekeeping cleaner, or janitor and

cleaner, all of which are available in significant numbers in the national and Louisiana

economies.  (Tr. 57-58).  She stated that janitor and cleaner was the only job whose

numbers would be reduced by the restrictions on public contact and teamwork, and that

the numbers would be reduced by 25 percent.

Plaintiff's attorney then asked Roberts:

Q.  Would an individual who works at a slow pace who exhibits poor
attention and who is very easily distracted be able to sustain those jobs you
identified on a consistent, regular, ongoing basis?
VE [vocational expert]:  Judge, can I answer that, or do you want him to
give me more specification information before I answer that?
ALJ:  Can you answer that based on that without more quantification of
limits?
VE:  Based on my interpretation of what that means, I would say no.
ALJ:  And you're interpreting what?
VE:  In terms of "easily distracted," meaning they're getting off task
continuously.  So maybe someone has to constantly tell them or redirect
them back [INAUDIBLE] to finish doing  that – not being consistent, but
they're maybe not completing all the tasks every day and [INAUDIBLE]
slow that means maybe every day they're not finishing what they need to
finish in terms of their quota for the day.  So in terms of being able to
sustain and maintain employment, that would be very difficult.
. . . .
Q [by attorney]:  Would the initial hypothetical – so working in a slow
pace, Ms. Roberts, an individual works at a slow pace.  Does that in and of
itself substantially reduce the available occupational base for unskilled
employment for an individual who cannot deal with the public effectively?

15

A.  I believe it does.

(Tr. 58-59).

Winn's attorney then asked Roberts to consider a hypothetical person with a combination of moderate impairments in several areas of work interactions, socially appropriate behavior and concentration, persistence and pace, which he described specifically.  (Tr. 59-60).  At the ALJ's request, the attorney defined "moderate" as "less than marked and more than mild" and quantified it as "that the individual have (sic) difficulty performing the task satisfactorily up to one-third of the time.  Acceptable? ALJ: Mm-hmm."  Roberts testified that an individual with these limitations would not be capable of sustaining employment.  (Tr. 60).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 17-19).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1.    The ALJ adequately considered whether plaintiff's impairments meet or equal Listing 12.05(C).

The ALJ found at step three of the sequential evaluation that Winn does not meet or medically equal any listing, specifically including Listing 12.05(C) for mental retardation, because plaintiff "does not have a valid verbal, performance, or full scale IQ

16

of 60 through 70 and a physical or other mental impairment imposing an additional and

significant work-related limitation of function."  (Tr. 16).  Winn argues that the ALJ

erred by failing to find that she meets this listing because she has a valid verbal IQ score

of 66 and because the ALJ found that she has other severe mental impairments of ADHD,

anxiety and an affective disorder.

> Listing 12.05 contains "an introductory paragraph with the diagnostic
> description for mental retardation" and "four sets of criteria (paragraphs A
> through D)."  [20] C.F.R. Listing 12.00(A).
>
>> 12.05 Mental retardation: Mental retardation refers to
>> significantly subaverage general intellectual functioning with
>> deficits in adaptive functioning initially manifested during the
>> developmental period; i.e., the evidence demonstrates or
>> supports onset of the impairment before age 22.
>>       The required level of severity for this disorder is met
>> when the requirements in A, B, C, or D are satisfied.[6]
>>       . . . .
>>       C.  A valid verbal, performance, or full scale IQ of 60
>> through 70 and a physical or other mental impairment
>> imposing an additional and significant work-related limitation
>> of function . . . .

Randall v. Astrue, 570 F.3d 651, 653 (5th Cir. 2009) (emphasis added).

A person claiming disability under Listing 12.05(C) must carry "the initial burden

of demonstrating that his impairment satisfies the introductory paragraph's diagnostic

description."  Id.  Thus, three requirements must be met to satisfy the listing:  "(a) the

claimant [currently] satisfies the diagnostic description's substantive requirements,

(b) the claimant shows that the impairment satisfying the diagnostic description's

---

[6]Winn does not argue that she meets paragraph (A), (B) or (D).

substantive requirement manifested during the developmental period, and (c) the claimant exhibits the severity criteria" of paragraph (C) during the period of alleged disability.  Id. (footnote omitted) (emphasis added).

In Randall, the Fifth Circuit affirmed the ALJ's finding that plaintiff did not meet Listing 12.05(C) because "the evidence does not demonstrate or support onset of the 'significantly subaverage general intellectual functioning with deficits in adaptive functioning' before age 22 . . . .  Moreover, the evidence does not demonstrate or support onset of 'deficits in adaptive functioning' before age 22."  Id. at 660.

In the instant case, Winn does not argue that she has significantly subaverage general intellectual functioning with deficits in adaptive functioning that initially manifested before age 22, and the record contains no substantial evidence of any such onset date.  She testified that she was in "reading lab" in grade school, but was not in special education classes.  (Tr. 32).  She told psychiatrist Eric Kramer, M.D., on May 11, 2011 that she had not been in special education classes.  (Tr. 377).  During a consultative examination on December 6, 2010, she told James M. Mours, Psy. D., that she had repeated the first grade and had been in a special class for reading and speech.  (Tr. 358).  See Hayes v. Comm'r of Social Sec., 357 F. App'x 672, 676 (6th Cir. 2009) (poor academic performance alone does not warrant a finding of onset of subaverage intellectual functioning before age twenty-two).  She graduated from high school without being in special education and she completed a subsequent vocational training course.

Plaintiff therefore fails in her burden to show that she meets the initial diagnostic and temporal requirements of Listing 12.05.  Without satisfying these criteria, she cannot meet the listing, regardless whether she currently meets the severity criteria of paragraph (C).  Randall, 570 F.3d at 659-60.

Even if Winn had presented any evidence that she meets the temporal requirement, substantial evidence supports the ALJ's finding that she does not meet the severity requirement of Listing 12.05(C).  Dr. Mours performed a consultative psychological examination and IQ testing of Winn on December 6, 2010, in which she achieved a verbal IQ score of 66.  (Tr. 358-60).  The ALJ accorded substantial weight (Tr. 19) to the findings of Dr. Mours and the non-examining psychological consultant, Julia Wood, Ph.D., who reviewed the medical records, including Dr. Mours's report, and completed a mental residual functional capacity assessment on December 22, 2010.  (Tr. 66-70). Winn argues that her valid verbal IQ score of 66, combined with her other severe mental impairments as found by the ALJ, contradict this finding and establish that she meets the severity requirement of paragraph (C).

Dr. Mours stated that plaintiff

achieved a Verbal Comprehension Index score of 66, a Perceptual Reasoning Index score of 75, a Working Memory Index score of 71, a Processing Speed Index score of 97, and a Full Scale score of 72, placing overall intellectual performance at the 3rd percentile, and in the Borderline Intellectual Functioning range within the normative age sample. . . .  The Full Scale score is interpretable.  The difference between the Verbal Comprehension Index score and Perceptual Reasoning Index score is

19

> significant. . . .  The current test scores are felt to be valid and reliable
> indicators of her present level of intellectual functioning.

(Tr. 359).

Although plaintiff has a verbal IQ score of 66, the ALJ is not required to accept

that score if the evidence as a whole does not support a finding that Winn suffers from

mental retardation.

> [A] Listing 12.05(C) claimant [must] satisfy the description's definition of
> mental retardation "in addition to" the severity criteria.  <u>An IQ between 60
> and 70 "is insufficient, even with the presence of some [additional]
> impairment, to establish disability per se on grounds of mental retardation."</u>
> Rather, "[t]he key term in the introductory paragraph of section 12.05 of
> the regulation, so far as bears on this case, is 'deficits in adaptive
> functioning.'"

<u>Randall</u>, 570 F.3d at 660 (quoting <u>Novy v. Astrue</u>, 497 F.3d 708, 709, 710 (7th Cir.

2007)) (emphasis added).

Plaintiff's activities, including her educational and employment history, are

inconsistent with mental retardation characterized by significantly subaverage general

intellectual functioning with significant deficits in adaptive functioning.  The Fifth

Circuit affirmed a similar finding in <u>Randall</u>.

> The ALJ, by relying on various kinds of evidence, including the . . .
> [psychologists'] reports, in particular, concluded that Randall failed to
> exhibit "significantly subaverage general intellectual functioning with
> deficits in adaptive functioning."  After reviewing the record that was
> before the ALJ, we agree that her ultimate finding as to Randall's adaptive
> functioning was backed by substantial evidence.  In particular, the <u>ALJ was
> entitled to rely on the clinical psychologists' specific analysis of Randall's
> physical and mental capabilities, including the determination that she</u>

suffered from only "mild/borderline" adaptive retardation and that her impairments "would not preclude gainful competitive employment."

Id. at 662 (citing Domingue v. Barnhart, 388 F.3d 462, 463 (5th Cir. 2004)) (emphasis added); see also Arce v. Barnhart, 185 F. App'x 437, 437-39 (5th Cir. 2006) (citing Morris v. Dretke, 413 F.3d 484, 487 (5th Cir. 2005); Selders, 914 F.2d at 619; 20 C.F.R. § 12.00(C)(1)) (Plaintiff with a full scale IQ score of 69, performance IQ of 66 and verbal IQ of 72 graduated from high school, was graded on a modified scale in school, took some special education courses, reads at the fifth grade level, spells at a sixth grade level and can do arithmetic at the third grade level.  Examining medical consultant reported that plaintiff had no deficits in adaptive functions.  Thus, she had borderline intelligence, was not mentally retarded and did not meet listing 12.05C.); Selders v. Sullivan, 914 F.2d 614, 619 (5th Cir. 1990) (plaintiff with verbal I.Q. of 70, performance I.Q. of 76 and full-scale I.Q. of 72 functioned within borderline range of intelligence and was not retarded).

As with any medical evidence, the ALJ is not "required to accept a claimant's IQ score.  Rather, the ALJ should examine the record to determine whether the proffered IQ score is reliable–that is, consistent with the claimant's daily activities and behavior.  An ALJ may reject IQ scores if they are inconsistent with the record." McGee v. Astrue, 291 F. App'x 783, 787 (8th Cir. 2008) (citing Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004)); accord Adkins v. Astrue, 226 F. App'x 600, 603 (7th Cir. 2007); Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003); Hamilton v. Shalala, 39 F.3d 319, 1994 WL 612289, at *1-2 (5th Cir. 1994) (citing Muse v. Sullivan, 925 F.2d 785, 790 (5th Cir.

1991)); Church v. Colvin, No. 11-3528-CV-S-REL-SSA, 2013 WL 1222044, at *26-27

(W.D. Mo. Mar. 25, 2013) (citing Johnson v. Astrue, 627 F.3d 316, 319-20 (8th Cir.

2010); Cheatum v. Astrue, 388 F. App'x 574 (8th Cir. 2010); Christner v. Astrue, 498

F.3d 790, 793-94 (8th Cir. 2007); Clay v. Barnhart, 417 F.3d 922, 930 (8th Cir. 2005);

Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004); Clark v. Apfel, 141 F.3d 1253,

1255 (8th Cir. 1998)); Reid v. Astrue, No. 3:10CV237, 2011 WL 4101302, at *5 (S.D.

Miss. Aug. 15, 2011), report & recommendation adopted, 2011 WL 4101277 (S.D. Miss.

Sept. 8, 2011); Inglet v. Astrue, No. 6:08-CV-014-C, 2009 WL 2981908, at *9-10 (N.D.

Tex. Sept. 17, 2009).

In this case, substantial evidence supports the ALJ's finding that Winn does not

meet the IQ requirement of Listing 12.05(C).  Based on Winn's employment history and

the lack of any evidence of special education, and despite Dr. Mours's notation that the

test scores were considered valid, Dr. Wood questioned even the validity of plaintiff's

higher, full scale score of 72.  (Tr. 69).  Although Dr. Wood noted that plaintiff's school

records could have been destroyed in a fire, Winn's own testimony and her comments

to Drs. Kramer and Mours indicate that she was not in special education classes in high

school.  Dr. Mours concluded that Winn's overall intellectual level was in the borderline

intellectual functioning range.  None of her other scores fell below 71, which is in the

borderline range.[7]  He noted that "her Full Scale score [of 72] is interpretable

---

[7]Scores of 85 to 114 on the Wechsler Adult Intelligence Scale show average intelligence, while
scores of 70 to 84 indicate borderline mental disability.  About.com Psychology, "What Is Considered

[presumably meaning 'understandable']," but he found "significant" the gap between her Verbal Comprehension Index score of 66 and her much higher Perceptual Reasoning Index score of 75.  (Tr. 359).  He observed that Winn demonstrated a simplistic and concrete thinking style, with some short-term memory problems and a poor fund of knowledge, but she had a strength in visual processing speed, she paid attention and she maintained adequate performance motivation during testing.  (Tr. 359).

Dr. Mours stated that Winn "appeared to give her best effort on the mental status examination and the IQ testing" and that, although she was nervous and "her attention was also poor, she exhibited the ability to concentrate with effort."  (Tr. 360).  He did not opine that Winn would be unable to work because of her intellectual difficulties.  To the contrary, he stated that, in a work setting, she

> would have difficulties in remembering detailed information, paying attention without distraction, managing her anxiety and working in a fast passed [sic] or stressful environment.  She would have adequate performance in understanding written and verbal instructions, concentrating and being persistent in her tasks, and acting in a socially appropriate manner.

Id.  He believed that she is capable of managing her own money.  Id.

Dr. Mours diagnosed plaintiff with anxiety and depressive disorders, attention deficit hyperactivity disorder and borderline intellectual functioning.  He assessed her

---

a Genius IQ Score?", http://psychology.about.com/od/psychologicaltesting/f/genius-iq-score.htm (last visited July 15, 2013).

with a current GAF score of 64,[8] which "reflects mild symptoms or 'some difficulty' in [social, occupational, or school functioning], but the individual 'generally function[s] pretty well.'" Sims v. Barnhart, 309 F.3d 424, 427 n.5 (7th Cir. 2002) (quoting Diagnostic and Statistical Manual of Mental Disorders 32); accord Garcia v. Astrue, 293 F. App'x 243, 246 (5th Cir. 2008) (citing Boyd v. Apfel, 239 F.3d 698, 700 & n.1 (5th Cir. 2001)). The opinions of Dr. Mours and Dr. Wood are substantial evidence on which the ALJ can rely and they are uncontradicted by any other medical evidence.

Thus, whether the ALJ's conclusion that Dr. Mours's finding that plaintiff "has borderline intellectual functioning as opposed to mental retardation results either in a finding that the claimant's [verbal IQ score of 66 is] not valid, or that the claimant does not satisfy the introductory portion of Listing 12.05, this Court concludes the ALJ's finding that the claimant does not satisfy the requirements of Listing 12.05(C) is supported by evidence in the record." James v. Comm'r of Soc. Sec., No. 09-0297, 2010 WL 5624513, at *8 (W.D. La. Dec. 16, 2010), report & recommendation adopted, 2011 WL 202140 (W.D. La. Jan. 18, 2011).

Accordingly, this assignment of error lacks merit.

_____

[8]The Global Assessment of Functioning Scale ("GAF") score represents a clinician's judgment of an individual's overall level of functioning. The reporting of overall functioning is done by using the GAF Scale, which is divided into ten ranges of functioning– e.g., 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for herself). The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. Lower GAF scores signify more serious symptoms. George v. Barnhart, 458 F. Supp. 2d 314, 323 n.5 (S.D. Tex. 2006) (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000)).

2.      The ALJ's assessment of Winn's mental residual functional capacity is supported by substantial evidence.  The ALJ's hypothetical to the vocational expert incorporated all of plaintiff's disabilities that the ALJ found credible and she did not improperly modify her own hypothetical.

In her memorandum, plaintiff discusses as a single assignment of error her contentions that the ALJ's assessment of her mental residual functional capacity is not supported by substantial evidence, that the ALJ's hypothetical to the vocational expert failed to incorporate all of plaintiff's disabilities and that the ALJ improperly modified her own hypothetical question.  Within the same discussion, Winn also argues that the ALJ's findings regarding her credibility are not supported by substantial evidence.

The ALJ found at step four of the sequential evaluation that Winn has the residual mental functional capacity to perform simple, unskilled tasks that require no timed production (no individually timed tasks); she cannot perform fast food work; she can have only incidental contact with the general public; and she cannot engage in team work (i.e., team member not required for task completion).  Plaintiff argues first that the ALJ's attempt at pages 54-57 of the transcript to clarify her question to the vocational expert regarding the hypothetical person's inability to perform timed production work (quoted above in Section C of this report and recommendation regarding the vocational expert's testimony) was an improper effort to obtain an answer that contradicted Roberts's initial answer that such a person could not perform any jobs.  Winn contends that the ALJ's questions reveal that she had already "reached her own vocational conclusion which she

25

subsumed in her final hypothetical, which is outside of her expertise and which is the reason for" vocational expert testimony.  Record Doc. No. 15 at p. 11.

Alternatively, Winn argues that the ALJ's mental residual functional capacity assessment and hypothetical questions were defective because they failed to incorporate all of the disabilities and limitations that the ALJ recognized when she afforded substantial weight to the opinions of Dr. Mours and Dr. Wood.  Dr. Wood reviewed the medical records, including Dr. Mours's report, and completed a mental residual functional capacity assessment on December 22, 2010.  She assessed a marked impairment in Winn's ability to interact with the public and moderate impairments in several other areas of her mental ability to function in a work setting.  (Tr. 68-70).  It is undisputed that the ALJ included a marked impairment in Winn's ability to interact with the public in her residual functional capacity determination.

Winn's attorney posed to Roberts the moderate impairments assessed by Dr. Wood.  He defined "moderate" as "the individual [would] have difficulty performing the task satisfactorily up to one-third of the time."  The vocational expert testified that a person with this combination of moderate impairments would not be able to sustain gainful employment.  (Tr. 59-60).  Plaintiff argues that the ALJ erred by failing to accept this answer.

"'The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity.'"  Cline v. Astrue, 577 F. Supp. 2d 835, 847-48

26

(N.D. Tex. 2008) (quoting Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985)) (citing

20 C.F.R. § 416.945(a), (b), (c)); accord Giles v. Astrue, 433 F. App'x 241, 245 (5th Cir.

2011) (citing 20 C.F.R. §§ 404.1520(e), 404.1545).

In this case, the ALJ's residual functional capacity determination is substantially

supported by the records of plaintiff's treating internist, Dr. Patel, and the opinions of Dr.

Mours and Dr. Wood, all of which the ALJ accurately summarized in her decision.

Because the record as a whole substantially supports the ALJ's findings, Winn has failed

to show that any minor inconsistencies in the ALJ's rationale, such as her incorrect

statement that Dr. Mours had "not observed [plaintiff] to be nervous, anxious or

otherwise uncomfortable" (Tr. 19),[9] affected Winn's substantial rights.

> "Procedural perfection in administrative proceedings is not required. This
> court will not vacate a judgment unless the substantial rights of a party
> have been affected." [Plaintiff] has noted several occasions where the ALJ
> did not thoroughly address each aspect of the record. Yet when dealing
> with such an extensive and multi-faceted record, there will always be some
> evidence that is not specifically discussed in the Commissioner's decision.
> Our review is limited to examining whether the decision to deny benefits
> is supported by substantial evidence in the record, and it is here.

Giles v. Astrue, 433 F. App'x 241, 251 (5th Cir. 2011) (quoting Mays v. Bowen, 837

F.2d 1362, 1364 (5th Cir. 1988)).

At the fifth step of the sequential evaluation, the ALJ may rely on vocational

expert testimony to reach conclusions about the specific requirements of a particular

---

[9]Dr. Mours stated that Winn was "nervous . . . ,  noticeably anxious and a little depressed at
times."  (Tr. 360).

occupation, including working conditions and the attributes and skills needed for the occupation.  20 C.F.R. § 404.1566(d), (e); <u>Villalpando v. Astrue</u>, 320 F. App'x 208, 211 (5th Cir. 2009); <u>Weary v. Astrue</u>, 288 F. App'x 961, 967 (5th Cir. 2008); <u>Leggett</u>, 67 F.3d at 565; SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000).  If "the claimant suffers from nonexertional impairments [as Winn does in the instant case] or a combination of exertional and nonexertional impairments, then the Commissioner <u>must</u> rely on a vocational expert to establish that such jobs [that the claimant can perform] exist in the economy."  <u>Newton</u>, 209 F.3d at 458 (emphasis added) (citation omitted); <u>accord</u> <u>Carey v. Apfel</u>, 230 F.3d 131, 145 (5th Cir. 2000).

An ALJ's hypothetical question is defective and will not be allowed to stand unless it reasonably incorporated all of the disabilities recognized by the ALJ, "and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)."  <u>Bowling v. Shalala</u>, 36 F.3d 431, 436 (5th Cir. 1994); <u>accord</u> <u>Vaught v. Astrue</u>, 271 F. App'x 452, 456 (5th Cir. 2008); <u>Masterson v. Barnhart</u>, 309 F.3d 267, 273 (5th Cir. 2002).

In the instant case, the ALJ posed a hypothetical to Roberts that accounted for Winn's age, education, work experience and mental limitations, which the ALJ found to

be credible.  The vocational expert testified that such a claimant could perform jobs such as dishwasher, maid and housekeeping cleaner, or janitor and cleaner.

The ALJ appropriately provided additional information to the vocational expert and asked follow-up questions to clarify her hypothetical question and the expert's testimony.  See James, 2010 WL 5624513, at *4-5 (rejecting plaintiff's argument that "the ALJ 'massaged' his hypothetical questions posed to the vocational expert . . . to coax answers indicating the claimant is not disabled," after the expert testified there were no jobs available for a claimant with (among other limitations) mild limitations in his abilities to understand simple instructions and commands, and to respond appropriately to normal changes in a routine work setting.  When the ALJ defined the term "mild" and questioned the vocational expert further, the expert testified that jobs were available that the claimant could perform.).

In the instant case, Winn's counsel questioned the vocational expert and asked her about the effects of plaintiff's moderate mental impairments, with the term "moderate" defined as "the individual [would] have difficulty performing the task satisfactorily up to one-third of the time."  Roberts testified that such a claimant could not perform any jobs.  However, the ALJ found that the record did not support such a restrictive requirement.  "It is well established . . . that the ALJ is not bound by vocational expert testimony that is based upon evidentiary assumptions that are ultimately rejected by the ALJ."  Castille v. Astrue,  No. 6:11-cv-01571, 2012 WL 6738177, at *7 (W.D. La.

Nov. 29, 2012), report & recommendation adopted, 2012 WL 6738171 (W.D. La. Dec. 27, 2012) (citing Masterson, 309 F.3d at 273; Owens v. Heckler, 770 F.2d 1276, 1282 (5th Cir. 1985)).

The ALJ incorporated into her mental residual functional capacity and her hypothetical questions to the vocational expert the limitations that she found credible, based on the entire record. Plaintiff argues that the ALJ's credibility finding is unsupported by the medical records, which document her long-term complaints to her treating internist, Dr. Patel, of attention deficit hyperactivity disorder, depression and anxiety and his prescriptions of medications for those conditions.

Dr. Patel's mere diagnosis of plaintiff's medical conditions does not establish her disability claims. Bordelon v. Astrue, 281 F. App'x 418, 421 (5th Cir. 2008) (citing Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983)); McLendon v. Barnhart, 184 F. App'x 430, 431(5th Cir. 2006); Harris v. Barnhart, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998); Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991); Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 87-88 (1st Cir. 1991); Martin v. Chater, No. 95 C 0245, 1995 WL 505955, at *6 (N.D. Ill. Aug. 23, 1995) (citing Anderson v. Sullivan, 925 F.2d 220, 222 (7th Cir. 1991)). Plaintiff "'must show that she was so functionally impaired by [her diagnosed impairment] that she was precluded from engaging in any substantial gainful activity.'" Bordelon, 281 F. App'x at 421 (quoting Hames, 707 F.2d at 165); accord Anthony v.

30

Sullivan, 954 F.2d 289, 293 (5th Cir. 1992); Hamauei v. Astrue, No. 10-85, 2011 WL
802398, at *7 (E.D. La. Feb. 28, 2011) (Lemelle, J.) (quoting Hames, 707 F.2d at 165).

The record does not substantially support the severe limitations that plaintiff
alleges, while it does substantially support the ALJ's reasons for discounting her
credibility. Winn testified that she saw Dr. Patel regularly. His progress notes document
her visits to him, including her complaints of depression, anxiety and attention deficit
hyperactivity disorder since at least 2007, for which he prescribed medications. Plaintiff
testified that he "kept recommending" that she see a psychiatrist. Nonetheless, as the
ALJ noted, Winn did not seek treatment from a mental health professional until
January 25, 2011, one month after the Commissioner denied her applications for benefits.
She was interviewed by a social worker at East Jefferson Medical Center on that date.
She tested positive for opiates and marijuana in an unplanned drug screen and she was
diagnosed with a depressive disorder, not otherwise specified. (Tr. 368-72). She
declined group therapy and was scheduled for evaluation by a psychiatrist on March 4,
2011.

Winn called the East Jefferson Medical Center a few days later to request an
earlier appointment. She said that she needed it for her Social Security appeal, which had
a 60-day time limit, and "she wants to see the doctor to appeal for her." She was told that
the doctor does not do the appeal. (Tr. 372). The ALJ's hearing was held on

February 18, 2011.  On March 4, 2011, plaintiff cancelled her appointment set for that date, stating that she "will come in to be seen when ready."  Id.

On May 11, 2011, Winn saw Eric Kramer, M.D., at the East Jefferson Medical Center for psychiatric evaluation.  (Tr. 372-86).  She denied illicit drug use despite her prior positive drug screen.  Dr. Kramer stated that she needed further assessment for substance abuse.  (Tr. 376).  He observed that her motor activity was unremarkable, she demonstrated normal speech and language, and she had an appropriate affect.  She was motivated and goal-oriented, had no difficulty attending to him and was not distractible. (Tr. 376-82).  Dr. Kramer noted the need to rule out panic disorder, polysubstance dependence and substance-induced mood disorder.  He diagnosed major depressive disorder, "S EPI [single episode?] SEV [severe] without PS [psychosis?]," and prescribed medication for depression, anxiety and insomnia.  (Tr. 372, 384-85).  He assigned a GAF score of 51 (Tr. 386), which "indicates 'moderate symptoms,' such as a flat affect, or 'moderate difficulty in social or occupational functioning.'"  Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (quoting Diagnostic and Statistical Manual of Mental Disorders 34).

Plaintiff returned to East Jefferson Medical Center on June 10, 2011.  She told Schoener LaPrairie, M.D., that her medications were helping.  She said she had good and bad days, but still felt very depressed and isolated because her days and nights were reversed.  Dr. LaPrairie told Winn that the medications Dr. Patel was prescribing and her

32

marijuana use could cause more depression and sleepiness.  Dr. LaPrairie planned to adjust her medications and encouraged her to stay awake during the day and sleep at night.  (Tr. 373).

Although plaintiff asserts in her memorandum that she has been treated by psychiatrist Charles Chester, M.D., the record contains no additional treatment records from any mental health professional, including Dr. Chester.  Thus, the record reflects only three visits to East Jefferson Medical Center for mental health treatment in January, May and June 2011.  Dr. Patel's progress notes from 2011 indicate that he continued to see Winn about once a month through July 5, 2011 and to prescribe medications for attention deficit hyperactivity disorder, anxiety and depression, as he had done before she sought mental health treatment at East Jefferson Medical Center.  (Tr. 387-99). His notes do not contain any indication that she had received psychiatric treatment at East Jefferson Medical Center.  Dr. Patel's March 23, 2012 report, which plaintiff submitted to the Appeals Council, states that "Winn is being followed up by Dr. Chester," but without any indication of how long or how many times plaintiff has seen Dr. Chester or what type of treatment he has provided.  (Tr. 410).  Dr. Chester's own report dated January 17, 2012 suffers from the same defects.  (Tr. 404-06).

In determining Winn's credibility, the ALJ appropriately considered her failure to seek professional mental health treatment until after her benefits applications were denied and her limited record of only three visits to East Jefferson Medical Center for

such treatment.  A claimant's lack of need for medication or failure to seek treatment is a relevant factor to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount plaintiff's complaints of disabling pain, depression or other limitations.  Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991).

In addition, as the ALJ noted, none of plaintiff's treating or examining physicians restricted her from working.  While Dr. Mours recognized that Winn would have difficulties in remembering detailed information, paying attention without distraction, managing her anxiety and working in a fast paced or stressful environment, he also stated that she would have adequate performance in understanding written and verbal instructions, concentrating and being persistent in her tasks, and acting in a socially appropriate manner in a work setting.

Based on the entire record, the ALJ found plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms not credible to the extent they are inconsistent with the ALJ's residual functional capacity assessment.  (Tr. 18).  The ALJ has the responsibility to evaluate the credibility of witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2002), and "credibility conclusions are 'precisely the kinds of determinations that the ALJ is best positioned to make.'"  Spruill v. Astrue, 299 F. App'x 356, 358 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164).  Thus, the ALJ's

credibility evaluation is entitled to <u>considerable deference</u> by this court.  <u>McKnight v. Astrue</u>, 340 F. App'x 176, 181 (5th Cir. 2009); <u>Bedford v. Astrue</u>, 236 F. App'x 957, 962 (5th Cir. 2007).  The ALJ's explanation of her reasons for finding plaintiff not entirely credible is all that is required.  <u>James J. Flanagan Stevedores, Inc. v. Gallagher</u>, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing <u>Falco</u>, 27 F.3d at 163); <u>Godbolt v. Apfel</u>, No. 98-1680, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999).

The non-examining psychologist, Dr. Wood, who reviewed plaintiff's medical records, assessed Winn's mental residual functional capacity based in large part on Dr. Mours's report and also concluded that Winn can work.  (Tr. 73).  As previously noted, the ALJ accorded substantial weight to both these psychologists' findings.  Contrary to plaintiff's argument that Dr. Wood found her credible, Dr. Wood found that Winn's allegations regarding her overall symptoms and limitations were "<u>partially</u> credible." (Tr. 68) (emphasis added).  Dr. Wood found plaintiff's allegations credible <u>only</u> as to each narrow area of functioning in which Dr. Wood assessed moderate limitations, but not as to the other areas in which she assessed mild or no limitations.  (Tr. 69-70).

As to those areas of moderate limitation, Dr. Wood opined nonetheless that Winn can understand, retain and follow simple instructions; sustain attention for up to two-hour blocks of time when performing simple and routine work-related tasks, follow simple work-like procedures and make simple work-related decisions; sustain the mental demands associated with performing such work throughout an ordinary work day and

week; relate to the general public on a limited basis, work with coworkers and supervisors in non-confrontational situations, and accept respectful supervision and constructive criticism; and would function best in standardized work environments with minimal variation.  (Tr. 69-70).

The Commissioner's regulations do not define "moderate" limitations.  The ALJ was not required to accept the definition of "moderate" that Winn's attorney proposed to the vocational expert.  That definition is not in accord with Fifth Circuit case law.  The Fifth Circuit has twice approved an ALJ's definition that "moderate" means "more than slight limitations but the person can still perform the task satisfactorily."   Giles v. Astrue, 433 F. App'x 241, 250 n.34 (5th Cir. 2011); Cantrell v. McMahon, 227 F. App'x 321, 322 (5th Cir. 2007).

Substantial evidence supports the ALJ's incorporation of Winn's single marked limitation and her several moderate limitations in the ALJ's hypothetical questions as the ability to perform simple, unskilled tasks that require no timed production (no individually timed tasks); she cannot perform fast food work; she can have only incidental contact with the general public; and she cannot engage in team work (i.e., team member not required for task completion).  Using these limitations, Roberts testified that there are jobs that plaintiff can perform.

"The ALJ expressly and rightly relied on the testimony of . . . the vocational expert, in reaching this conclusion.  [Plaintiff] offered no contrary evidence and thus did

not satisfy [her] burden to prove that [she] could not perform the kinds of jobs identified by" the vocational expert.  <u>Masterson</u>, 309 F.3d at 273.  Accordingly, this assignment of error lacks merit.

3.     The Commissioner adequately considered the treating source opinions by Drs. Patel and Chester.

After the ALJ rendered her decision and plaintiff requested review, she submitted questionnaire responses to the Appeals Council that her attorney had solicited from Dr. Patel, dated March 23, 2012 (Tr. 410-11), and Dr. Chester, dated January 17, 2012.  (Tr. 404-06).   Both reports contain handwritten responses to typed questions posed by plaintiff's attorney, with an introductory paragraph stating that the attorney "represent[s] Tina Winn in her claim for Disability benefits, which was recently denied" and that "[i]t would be of great help if you could please answer the following questions regarding Tina's impairment."   The attorney enclosed a copy of Dr. Mours's report for each physician to review.  (Tr. 404, 410).  The Appeals Council stated that it considered this evidence, but found that the evidence did not provide a basis for changing the ALJ's decision.  (Tr. 1-2).  Winn argues that the Appeals Council failed adequately to consider these two treating source opinions, which she contends substantially support her allegations of a marked inability to sustain concentration, persistence and pace that precludes her from maintaining employment.

First, plaintiff's reliance on <u>Higginbotham v. Barnhart</u>, 405 F.3d 332, 337-38 (5th Cir. 2005), is misplaced.  The Fifth Circuit did <u>not</u> hold in that case that "the Appeals

37

Council had failed properly to consider and weigh a treating source opinion on mental limitations," as Winn argues.  Record Doc. No. 15 at p. 18.  The appellate court held that the <u>district court</u> had erred in failing to consider as part of the administrative record the evidence that plaintiff had submitted for the first time to the Appeals Council, which the Council had accepted and reviewed when denying plaintiff's appeal.  <u>Higginbotham</u>, 405 F.3d at 334, 337.  In the instant case, the Commissioner does not dispute that the two reports submitted to the Appeals Council are part of the record that this court must review, and I have reviewed them.

Second, Winn alleges in her memorandum that Dr. Chester is her treating psychiatrist at East Jefferson Medical Center.  Record Doc. No. 15 at p. 17.  Other than Dr. Patel's statement in his March 23, 2012 report (six months after the ALJ's decision) that "Winn is being followed up by Dr. Chester" (Tr. 410), there is no <u>evidence</u> in the record that Dr. Chester has seen Winn at all, much less that he is a <u>treating</u> physician (or even a psychiatrist, although the court will assume that he is).  Dr. Chester could only have treated Winn between June 10, 2011 (the date of her last documented visit to East Jefferson Medical Center, when she saw Dr. LaPrairie) and January 17, 2012, the date of his report.  Because his report is unsupported by any treatment notes or other medical records, it is unknown how many times he saw plaintiff over what period of time, what treatment he rendered and what progress she made.  Winn fails in her burden to show that Dr. Chester was a treating source. Thus, Dr. Chester's opinions are not entitled to the

great weight ordinarily due to a treating source opinion, 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2), which is based on the claimant's "ongoing treatment relationship" with

such a medical source.  20 C.F.R. § 404.1502.

Even if Dr. Chester is a treating psychiatrist, the Appeals Council had good cause

to assign little or no weight to his completely unsupported January 17, 2012 report.

> The treating physician's opinions are not conclusive.  The opinions may be
> assigned little or no weight when good cause is shown.  Good cause may
> permit an ALJ to discount the weight of a treating physician relative to
> other experts where the treating physician's evidence is conclusory, is
> unsupported by medically acceptable clinical, laboratory, or diagnostic
> techniques, or is otherwise unsupported by the evidence.

Newton, 209 F.3d at 455-56 (quotations and citations omitted).

In addition, to the extent that Drs. Chester and Patel reviewed and agree with Dr.

Mours's findings, their opinions are merely cumulative and would not have changed the

outcome.  Similarly, to the extent that Dr. Patel's opinions on his report are merely

cumulative of his own treatment notes, the ALJ already considered those records and the

new opinions would not have changed the outcome.

Finally, to the extent that Drs. Patel and Chester opine as to Winn's credibility or

that she cannot work, those determinations may be made only by the Commissioner.

Spruill v. Astrue, 299 F. App'x at 358; Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir.

2003); Masterson, 309 F.3d at 272; Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir.

2001); see also Social Security Ruling 96-5p, 1996 WL 374183, at *2 ("[T]reating source

opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance.").

Accordingly, this assignment of error lacks merit.

## CONCLUSION

The ALJ adequately considered whether plaintiff's impairments meet or equal Listing 12.05(C).  The ALJ's assessment of Winn's mental residual functional capacity is supported by substantial evidence.  The ALJ's hypothetical to the vocational expert incorporated all of plaintiff's disabilities that the ALJ found credible and she did not improperly modify her own hypothetical.  The Appeals Council adequately considered the post-decision opinions of Drs. Patel and Chester.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v.

United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[10]

New Orleans, Louisiana, this ____19th____ day of July, 2013.

_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[10]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.